http://www.va.gov/vetapp16/Files5/1639900.txt

Citation Nr: 1639900 
Decision Date: 09/30/16 Archive Date: 10/13/16

DOCKET NO. 10-11 181 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Portland, Oregon

THE ISSUES

1. Entitlement to service connection for posttraumatic stress disorder (PTSD).

2. Entitlement to service connection for liver disability due to residuals of Korean Hemorrhagic Fever (KHF).

3. Entitlement to service connection for kidney disability due to residuals of KHF.

4. Entitlement to service connection for bladder disability due to residuals of KHF.

5. Entitlement to service connection for a pulmonary/respiratory disability due to residuals of KHF. 

6. Entitlement to service connection for stomach disability, to include the currently diagnosed gastroesophageal disease (GERD), due to residuals of KHF.

7. Entitlement to service connection for bilateral hearing loss.

REPRESENTATION

Veteran represented by: Oregon Department of Veterans' Affairs

ATTORNEY FOR THE BOARD

M. C. Wilson, Associate Counsel

INTRODUCTION

The Veteran served on active duty from December 1952 to October 1954. 

This case comes before the Board of Veterans' Appeals (Board) on appeal from a June 2008 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Portland, Oregon.

These matters were previously before the Board in June 2015, when it was remanded for additional development. Pursuant to the remands' directives, the RO made reasonable attempts to obtain pertinent private treatment records, obtained outstanding VA treatment records, provided examinations and obtained medical opinions, and readjudicated the claims. Review of the record shows substantial compliance with the June 2015 remand; thus, additional development is not necessary. See Stegall v. West, 11 Vet. App. 268 (1998).

This appeal has been advanced on the Board's docket pursuant to 38 C.F.R. § 20.900(c) (2015). 38 U.S.C.A. § 7107(a)(2) (West 2014).

FINDINGS OF FACT

1. The Veteran does not currently have PTSD, nor has he had PTSD at any time during the period on appeal.

2. The Veteran does not currently have a liver disability, nor has he had a liver disability at any time during the period on appeal.

3. A kidney disability did not have its onset during active service, nor was a kidney disability otherwise caused or aggravated by the Veteran's period of active service.

4. A bladder disability did not have its onset during active service, nor was a bladder disability otherwise caused or aggravated by the Veteran's period of active service.

5. A pulmonary/respiratory disability did not have its onset during active service, nor was a pulmonary/respiratory otherwise caused or aggravated by the Veteran's period of active service.

6. GERD did not have its onset during active service, nor was GERD otherwise caused or aggravated by the Veteran's period of active service.

7. A bilateral hearing loss disability was not caused by active service, did not manifest to a compensable degree within one year of active service, and is not otherwise the result of active service.

CONCLUSIONS OF LAW

1. The criteria for service connection for PTSD have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304(f) (2015).

2. The criteria for service connection for a liver disability have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

3. The criteria for service connection for a kidney disability have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).
 4. The criteria for service connection for a bladder disability have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

5. The criteria for service connection for a pulmonary/respiratory disability have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303 (2015).

6. The criteria for service connection for GERD have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, (2015).

7. The criteria for service connection for bilateral hearing loss have not been met. 38 U.S.C.A. §§ 1101, 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309(a), 3.385 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. VA's Duties to Notify and Assist

VA has met all statutory and regulatory notice and duty to assist provisions. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326 (2015). A March 2008 letter satisfied the duty to notify provisions and included proper notice to the Veteran regarding the regulations pertinent to the establishment of an effective date and of the disability rating. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1); Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002); Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006).

In addition, pursuant to VA's duty to assist in the development of a claim, VA provided multiple examinations and associated with the Veteran's claims file his VA treatment records. 38 U.S.C.A. § 5103A(c)-(d); 38 C.F.R. § 3.159(c)(3)-(4). The Board notes that pursuant to the Board's June 2015 remand directives, the AOJ requested that the Veteran authorize VA to obtain any outstanding and pertinent private treatment records, to include an occupational hearing test that was conducted by Douglas County, State Industrial of Oregon. In response to this request, the Veteran indicated in October 2015 that his relevant treatment records are on file at a local VA medical center. See General Release for Medical Provider Information to VA (VA Form 21-4142a), received Oct. 23, 2015. Thus, the Board finds that no further action is necessary in this regard.

After the June 2015 Board remand was issued, VA provided examinations and obtained medical opinions in September 2015, October 2015, and March 2016. Review of the examination reports indicate that these examinations and opinions are adequate because the examiners considered the relevant history of the claimed conditions, provided sufficiently detailed descriptions of the disabilities, and provided analysis to support their opinions concerning the etiology of the conditions. Nieves-Rodriguez v. Peake, 22 Vet. App. 295, 304 (2008); Stefl v. Nicholson, 21 Vet. App. 120, 123-24.

Unfortunately, the veteran's service treatment records (STRs) were presumably destroyed in a fire at the National Personnel Records Center (NPRC) in 1973. The Veteran was informed, via a June 2013 letter, that his STRs were unavailable. The record reflects that all indicated development to obtain the STRs and alternative records has been completed and that further development to obtain STRs would be futile. A formal finding of such was rendered in June 2013. 

There is no indication in the record that any additional evidence relevant to the issues decided herein is available and has not been associated with the claims file. See Pelegrini v. Principi, 18 Vet. App. 112 (2004). Thus, all necessary development has been accomplished and appellate review may proceed without prejudice to the Veteran. See Bernard v. Brown, 4 Vet. App. 384 (1993).

II. Claims for Service Connection

The Veteran asserts that he developed PTSD and bilateral hearing loss due to combat service in Korea. He also asserts that he is entitled to service connection for liver, kidney, bladder, pulmonary/respiratory, and stomach disabilities because they developed secondary to KHF which he had in service. 

As noted in its June 2015 decision, the Board concedes that the Veteran did have KHF during service. Notably, the Veteran reported being hospitalized between September 1953 and November 1953 in Seoul, having come down with a fever. He remembered that the Giants baseball team players visited the hospital during his stay, and he submitted newspaper articles from November 1953 confirming such. Additionally, the Veteran's spouse submitted a written statement indicating that as soon as the Veteran returned from service he mentioned having been sick with hemorrhagic fever or something like the plague. Finally, the August 2012 infectious disease examiner indicated that the Veteran had inactive KHF, which has been inactive since the 1950s.

Generally, service connection may be established for disability resulting from personal injury suffered or disease contracted in the line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, or air service. 38 U.S.C.A. §§ 1110, 1131 (West 2014). Service connection may also be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2015).

To establish service connection for a disability resulting from a disease or injury incurred in service, or to establish service connection based on aggravation in service of a disease or injury that pre-existed service, there must be (1) competent evidence of the current existence of the disability for which service connection is being claimed; (2) competent evidence of incurrence or aggravation of a disease or injury in active service; and (3) competent evidence of a nexus or connection between the current disability and the disease or injury incurred or aggravated in service. Horn v. Shinseki, 25 Vet. App. 231, 236 (2010); Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009). In many cases, medical evidence is required to meet the requirement that the evidence be "competent." However, when a condition may be diagnosed by its unique and readily identifiable features, the presence of the disorder is not a determination "medical in nature" and is capable of lay observation. Barr v. Nicholson, 21 Vet. App. 303, 309 (2007).

Service connection for certain chronic diseases (including cirrhosis, nephritis, psychoses, and peptic ulcers) may be established on a presumptive basis by showing that the disease manifested itself to a degree of 10 percent or more within one year from the date of separation from service. 38 U.S.C.A. §§ 1101, 1112 (West 2014); 38 C.F.R. §§ 3.307(a)(3), 3.309(a) (2015). In such cases, the disease is presumed under the law to have had its onset in service even though there is no evidence of that disease during the period of service. 38 C.F.R. § 3.307(a). In other words, "there is no 'nexus' requirement for compensation for a chronic disease which was shown in service, so long as there is an absence of intercurrent causes to explain post-service manifestations of the chronic disease." Walker v. Shinseki, 708 F.3d 1331, 1336 (Fed. Cir. 2013). If evidence of a chronic condition is noted during service or during the presumptive period, but the chronic condition is not "shown to be chronic, or where the diagnosis of chronicity may be legitimately questioned," i.e., "when the fact of chronicity in service is not adequately supported," then a showing of continuity of symptomatology after discharge is required to support a claim for disability compensation for the chronic disease. Proven continuity of symptomatology establishes the link, or nexus, between the current disease [and service] and serves as the evidentiary tool to confirm the existence of the chronic disease while in service or a presumptive period during which existence in service is presumed." Id.

Notably, evidence of a present disability is necessary before service connection may be granted. See Brammer v. Derwinski, 3 Vet. App. 223, 225 (1992) ("Congress specifically limits entitlement to service-connected disease or injury where such cases have resulted in a disability . . . in the absence of a proof of present disability there can be no claim."). The requirement of a "current disability" is satisfied if a disorder is diagnosed at the time a claim is filed or at any time during the pendency of the appeal. See McClain v. Nicholson, 21 Vet. App. 319, 321 (2007); see also Romanowsky v. Shinseki, 26 Vet. App. 289, 293 (2013).

Determinations as to service connection will be based on review of the entire evidence of record, to include all pertinent medical and lay evidence, with due consideration to VA's policy to administer the law under a broad and liberal interpretation consistent with the facts in each individual case. 38 U.S.C.A. § 1154(a) (West 2014); 38 C.F.R. § 3.303(a).

A. PTSD

Service connection for PTSD in particular requires medical evidence diagnosing the condition under the criteria of the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), or by findings supported in an examination report; a link, established by medical evidence, between current symptoms and an in-service stressor; and credible supporting evidence that the claimed in-service stressor occurred. 38 C.F.R. §§ 3.304(f), 4.125(a) (2015).

If a stressor claimed by a veteran is related to the veteran's fear of hostile military or terrorist activity and a VA psychiatrist or psychologist, or a psychiatrist or psychologist with whom VA has contracted, confirms that the claimed stressor is adequate to support a diagnosis of PTSD and that the veteran's symptoms are related to the claimed stressor, in the absence of clear and convincing evidence to the contrary, and provided the claimed stressor is consistent with the places, types, and circumstances of the veteran's service, the veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor. 38 C.F.R. § 3.304(f)(3). For VA purposes, "fear of hostile military or terrorist activity" means that a veteran experienced, witnessed, or was confronted with an event or circumstance that involved actual or threatened death or serious injury, or a threat to the physical integrity of the veteran or others. Id. 

Importantly, during the course of the appeal the regulations pertaining to psychiatric disorders were amended. See 79 Fed. Reg. 45,093 (Aug. 4, 2014) (effective Aug. 4, 2014). Specifically, the regulations were updated so that all psychiatric diagnoses must be in conformity with diagnostic criteria in the DSM-5, as opposed to the DSM-IV. Id. However, the regulation states that it was not the intent of the Secretary to have the rule change apply to cases that had been certified to or were pending before the Board at the time of the change. Id. Therefore, the amended regulation would not apply to cases that had been certified to or were pending before the Board as of August 4, 2014. As the Veteran's claim was certified to the Board in February 2015, the amended regulation applies. Therefore, in this case, the issue of whether the Veteran has a diagnosis of PTSD will be determined based on the criteria in the DSM-V.

An August 2012 VA PTSD examination report indicates that the Veteran does not meet the criteria for a diagnosis of PTSD pursuant to the DSM-IV and does not have another mental disorder.

In March 2016, VA obtained an addendum opinion to determine whether the Veteran meets the criteria for a diagnosis of PTSD under the DSM-5 and in light of the Veteran's conceded combat service. Similarly, in March 2016, the psychologist who conducted the August 2012 examination noted that the Veteran does not meet the criteria for a diagnosis of PTSD according to DSM-5. The psychologist noted that after conceding combat in service and even if a stressor is conceded, the Veteran and his wife did not report PTSD symptoms in August 2012.

The Board finds the August 2012 and March 2016 examination and opinions highly probative because they were offered based on review of the entire claims file and were provided with supporting rationale. See Jandreau v. Nicholson, 492 F.3d 1372, 1376 (Fed. Cir. 2007) (noting that "the Board retains discretion to make credibility determinations and otherwise weigh the evidence submitted"); see also Nieves-Rodriguez, 22 Vet. App. at 304 (noting that "most of the probative value of a medical opinion comes from its reasoning. Neither a VA medical examination report nor a private medical opinion is entitled to any weight . . . if it contains only data and conclusions.").

Overall, the evidence fails to show that the Veteran had PTSD at any time during the pendency of his appeal-from the time that he filed his claim for compensation benefits in February 2008 to the present. In so finding, the Board notes that lay evidence alone is not competent to diagnose PTSD; and entitlement to service connection for this condition cannot arise until the pertinent regulatory requirements are satisfied, including the existence of medical evidence diagnosing the condition. See 38 C.F.R. §§ 3.304(f), 4.125(a); see also Young v. McDonald, 766 F.3d 1348 (2014). Thus, the Veteran is not competent to provide evidence pertaining to complex medical issues such as the diagnosis and etiology of a psychiatric disorder, as such a question is not answerable by personal observation alone or by the application of knowledge within the realm of a layperson. Jandreau, 492 F.3d at n.4; Layno v. Brown, 6 Vet. App. 465, 469-70 (1994).

Overall, the competent evidence of record fails to show that the Veteran has PTSD due to service. Additionally, the record fails to show that the Veteran currently has any other psychiatric disorders that may be attributed to service. Thus, the evidence is against granting service connection for PTSD because there is no evidence of a present disability, and the appeal must be denied as to this issue. See Brammer, 3 Vet. App. at 225. There is no doubt to be resolved in this case. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

B. Liver Disability

In September 2015, a VA examiner endorsed that the Veteran did not have and has never been diagnosed with a liver condition. The examiner noted that the Veteran does not recall anything about having KHF during service except that he was sick for a few months and did not want to eat. The examiner explained that although the Veteran has asserted that he has liver problems due to KHF, he reported to the examiner that he has not had a liver condition. Thus, the examiner concluded that it is less likely than not (less than 50 percent probability) that the Veteran has a liver condition due to service, or more specifically, due to his having had KHF.

Overall, the evidence fails to show that the Veteran had a liver disability at any time during the pendency of his appeal-from the time that he filed his claim for compensation benefits in February 2008 to the present. In so finding, the Board acknowledges the Veteran's assertion that he has a liver disability due to KHF, but finds that he is not competent to diagnose a liver condition because such a condition cannot be diagnosed by the application of knowledge within the realm of a lay person. See Jandreau, 492 F.3d at 1377 and n.4; Layno, 6 Vet. App. at 469-470.

Thus, although it has been conceded that the Veteran had KHF during service, the evidence is against granting service connection for a liver disability because there is no evidence of a present disability. See Brammer, 3 Vet. App. at 225. The appeal is denied as to this issue; there is no doubt to be resolved. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 49.

C. Kidney Disability and Bladder Disability

In October 1979, the Veteran complained of questionable enlarged prostate and reported urinary changes over the past few months. A clinician noted that the Veteran's prostate was normal at that time. In March 1992 and July 1992, he reported having pain during urination and a clinician noted diagnoses of benign prostatic hyperplasia/hypertrophy (BPH), chronic prostatitis, and urethral stricture. In February 1993, the Veteran had a urinary tract infection (UTI) and complained of pain and bladder spasms. At that time, a clinician noted that the Veteran did not have a history of UTI and had catheterization associated with KHF in 1953. In February 1993, the Veteran underwent urethral dilatation, transurethral resection of the prostate, and transurethral incision of the vesicle neck.

In January 2008, a clinician noted that the additional Tylenol PM that the Veteran was taking to help with sleep can also lead to urinary retention, but the Veteran reported the he was able to urinate without difficulty at that time.

In March 2008, a clinician noted that the Veteran has a past history of BPH with mild outlet obstruction symptoms.

In August 2012, VA provided a kidney conditions examination during which an examiner noted that the Veteran was diagnosed with renal insufficiency in November 2009 and that the Veteran's history of urinary obstruction may be the cause of his mild renal insufficiency. After providing excerpts from UpToDate articles that address the relationship between KHF (now called hantavirus) and the renal system, the examiner opined that it is less likely than not that the Veteran's chronic renal insufficiency, which was indicated by a low glomerular filtration rate (GFR) since 2009, is due to his in-service KHF because current medical literature states that most patients generally return to baseline GFR after an episode of acute renal failure related to hantavirus infection, and long term sequelae were best illustrated in observational studies done five, six, and ten years after virus-induced nephropathy. At five to six years, patients had a higher GFR compared with healthy controls, but hyperfiltration and proteinuria resolved by ten years.

In September 2015, a VA examiner noted a diagnosis of nephrolithiasis, or kidney stones, and indicated that this condition may date back to 2005. The examiner noted that the Veteran does not recall ever having had a kidney disease, but his wife stated that that the Veteran was informed that his kidney function was borderline around 2009 due to not drinking enough water, which improved with better hydration habits, and the Veteran had a single kidney stone in 2005. The examiner opined that it is less likely than not that the Veteran's current nephrolithiasis was incurred in or caused by service and there is "no evidence that patients that have had KHF have any long[-]term health effects and no evidence at all about them having kidney stones decades later."

Also during the September 2015 examination, a diagnosis of BPH with bladder obstruction was noted, and the Veteran denied having any urinary symptoms at that time. Similar to the argument presented above with regard to the Veteran's claimed kidney disability, the examiner noted that there is no evidence that patients that have had KHF have long-term prostate or bladder problems of any kind, the Veteran's BPH began decades after having his KHF episode, and therefore, it is less likely than not that his BPH was incurred or caused by having had KHF during service. The examiner also stated that it is less likely than not that this condition was incurred in or caused by service, generally.

Overall, the competent evidence of record shows that the Veteran has been diagnosed with renal insufficiency, nephrolithiasis, and BPH with bladder obstruction during the period on appeal, but fails to show that any of these disabilities had onset during service or were otherwise caused by service, to include the Veteran's inactive KHF.

Thus, the evidence fails to show that the Veteran has a kidney or bladder disability that may be attributed to his period of active service. Again, the Board acknowledges the Veteran's assertion that he has kidney and bladder disabilities due to KHF, but finds that he is not competent to provide evidence pertaining to complex medical issues such as the etiology of his kidney and bladder conditions, which cannot be determined by the application of knowledge within the realm of a lay person. See Jandreau, 492 F.3d at 1377 and n.4; Layno, 6 Vet. App. at 469-470.

As the competent evidence of record is against granting service connection for a kidney or bladder disability, the appeal must be denied as to these issues. There is no doubt to be resolved. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 49.

D. Pulmonary/Respiratory Disability

In February 1993, VA chest imaging showed no abnormality of the lungs. Similarly, in October 1996, a VA radiologist noted that there was no active pulmonary disease or sign of congestive failure at that time, and indicated that no acute intra-thoracic disease was identified.

However, in November 1996, the Veteran complained of a "head cold," runny nose, and cough, and a clinician noted that there were a few rhonchi in the Veteran's chest at that time. In November 2000, a VA physician noted an impression of moderate obstructive airway disease, and a December 2000 discharge summary notes a diagnosis of COPD.

In September 2015, an examiner noted that the date of diagnosis for COPD is unknown and that the Veteran does not know how long he has had COPD. The examiner also noted that the Veteran had asthma as a youth, but this condition resolved, and a September 2014 chest X-ray was normal. The examiner opined that it is less likely than not that the Veteran's claimed COPD was incurred in or caused by service because it was caused by his long-term smoking and there is no evidence of long-term respiratory health effects from having had KHF. Thus, it is less likely than not that the Veteran's COPD is due to his having had KHF during service.

Also in September 2015, a VA examiner noted that the Veteran has a diagnosis of allergic rhinitis, and the date of diagnosis for this condition is unknown. The examiner documented the Veteran's report that he had "allergies and hay fever" as a youth and that these are the same symptoms that he continues to treat. The examiner opined that it is less likely than not that the Veteran's allergic rhinitis was incurred in or caused by service because the Veteran's pre-service allergies and hay fever (also known as allergic rhinitis) did not change or worsen during service.

The Board notes that generally, a preexisting injury or disease will be considered to have been aggravated by service where there is an increase in disability during such service, unless there is a specific finding that the increase in disability is due to the natural progress of the disease. 38 U.S.C.A. § 1153 (West 2014); 38 C.F.R. § 3.306(a) (2015). Here, however, the Veteran has not asserted that his allergic rhinitis worsened during service. Further, absent an entrance examination, the presumption of aggravation is not for application. See Smith v. Shinseki, 24 Vet. App. 40, 45 (2010)

In summary, the evidence fails to show that the Veteran's COPD or allergic rhinitis may be attributed to his period of active service. Although the Veteran has asserted otherwise, he is not competent to provide evidence pertaining to complex medical issues such as the etiology of pulmonary and respiratory conditions. See Jandreau, 492 F.3d at 1377 and n.4; Layno, 6 Vet. App. at 469-470.

Thus, the competent evidence of record is against granting service connection for a pulmonary/respiratory disability, and the appeal must be denied as to this issue. There is no doubt to be resolved. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 49.

E. Stomach Disability

A December 2000 discharge summary notes a diagnosis of reflux esophagitis, chronic constipation, and a history of diverticulosis. In February 2001, the Veteran took medication, which he identified as morphine, to alleviate pain that he attributed to his now service-connected right knee disability, and he reported experiencing upset stomach due to that medication. In March 2008, a VA clinician noted that the Veteran's abdomen was soft, his bowel tones were active, and no abnormal pulsation was noted.

In August 2012, VA provided an infectious diseases examination during which it was noted that the Veteran has inactive KHF that has been productive of IBS, which is one of the Veteran's service-connected disabilities.

In September 2015, a VA examiner endorsed that the Veteran does not have a stomach or duodenum condition, but has GERD. The examiner opined that it is less likely than not that this condition was incurred in or caused by service. The examiner explained that there is no evidence of any clear long-term effects from having had KHF; thus, it is less likely than not that the Veteran's GERD was incurred or caused by his having had KHF in service.

As there is no competent evidence to the contrary, the Board finds that service connection is not warranted for GERD. Again, the evidence fails to show that this condition may be attributed to the Veteran's period of active service. Although the Veteran has submitted statements to the contrary, the Board finds that he is not competent to provide evidence pertaining to complex medical issues such as the etiology of his GERD. See Jandreau, 492 F.3d at 1377 and n.4; Layno, 6 Vet. App. at 469-470.

Thus, the competent evidence of record is against granting service connection for GERD, and the appeal must be denied as to this issue. There is no doubt to be resolved. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 49.

F. Bilateral Hearing Loss

Service connection for hearing loss may be granted where there is credible evidence of acoustic trauma due to significant noise exposure in service, where postservice audiometric findings indicate that there is a hearing loss disability, and where there is a sound basis upon which to attribute the postservice findings to the in-service injury (as opposed to incurrent causes). See Hensley v. Brown, 5 Vet. App. 155, 157-59 (1993).

For the purposes of the applying the laws administered by VA, impaired hearing will be considered to be a disability when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385 (2015). "The threshold for normal hearing is between 0 and 20 [decibels], and higher thresholds indicate some degree of hearing loss." Hensley, 5 Vet. App. at 157.

The record does not show that the Veteran had a hearing loss disability upon his separation from service nor does the evidence demonstrate that he has a hearing loss disability that manifested to a compensable degree within the first year after his discharge from active service, as there is no evidence of hearing loss until many years after his separation from service.

In his March 2010 substantive appeal (VA Form 9), he reported that he noticed hearing loss when he started working outdoors and he failed a hearing test done by Douglas County, State Industrial of Oregon. As acknowledged previously, notwithstanding VA's efforts to obtain these hearing test results, the Veteran has not authorized VA to obtain them.

In August 2012, VA provided an audiology examination during which speech recognition scores of 38 percent and 40 percent were documented for the right and left ears, respectively. At that time, the following pure tone thresholds were recorded, in decibels:

HERTZ
Aug. 2012
500
1000
2000
3000
4000
RIGHT
30
45
90
105+
105+
LEFT
40
55
90
105+
105+

The examination report reflects the examiner's opinion that although the configuration of the Veteran's hearing loss is consistent with a history of noise, the Veteran reported being a logger from 1979 through 1996, he spent considerable time falling timber without the consistent use of ear protection, and he also ran a caterpillar. The examiner noted that the Veteran spent two years in the service as a truck driver and working in the motor pool and the Veteran's wife of fifty-six years stated that she did not notice that the Veteran had hearing problems when they were first married. Instead, she reported noticing the majority of his hearing problems in the early 1980s. The examiner reported that it is more logical to conclude that seventeen years working in the lumber industry without consistent use of hearing protection was more damaging to the Veteran's hearing than two years of military service. Therefore, the Veteran's hearing loss is more likely due to the effects of occupational noise rather than military noise.

In October 2015, VA obtained another medical opinion, which addresses the Veteran's lay statements concerning the date of onset of his hearing problems and to account for the Veteran's in-service exposure to combat noise in addition to noise from the motor pool. After review of the record, a VA audiologist opined in October 2015 that the Veteran's hearing loss was less likely than not caused by noise exposure in service. The audiologist noted that the Veteran's wife's statements are not consistent with his claim, as she indicated that she did not notice his hearing problems for many years (decades) after leaving service. In addition, after noting that the Veteran's service in combat has been conceded, the audiologist noted that the Veteran reported that his main duties were driving a truck and working in the motor pool, and the Veteran has a significant occupational history of working in an industry known to involve excessive noise. Further, the Veteran reported that he spent years falling timber and using a chainsaw without consistent use of ear protection, and he ran heavy equipment. Thus, based on the Veteran's own statements, his wife's statements, his age, and the lack of any evidence to the contrary, the audiologist concluded that there was a long-term history of occupational noise without consistent use of ear protection, and there was a higher probability (greater than 50 percent) that occupational noise damaged his hearing more so than noise exposure in service.

Because the audiologist reviewed the claims file and offered an opinion supported by sufficient rationale, the Board finds the October 2015 opinion both adequate and probative. See Monzingo v. Shinseki, 26 Vet. App. 97, 105 (2012) ("[e]xamination reports are adequate when they sufficiently inform the Board of a medical expert's judgment on a medical question and the essential rationale for that opinion.").

The Board acknowledges the Veteran's assertions that his current hearing loss may be attributed to his period of active service. However, although he is competent to provide evidence concerning personal observations such as his symptoms and the onset of his symptoms, the Board finds that he is not competent to provide evidence pertaining to complex medical issues such as the etiology of his hearing disability. Jandreau, 492 F.3d at 1377; Davidson, 581 F.3d at 1316 (although non-expert opinions regarding nexus are not to be categorically rejected, a layperson's competence to provide a nexus opinion depends on the facts of the particular case). Whether hearing loss is due to service is a complex question that is not answerable by personal observation alone or by the application of knowledge within the realm of a lay person. See Layno, 6 Vet. App. at 469-70; see also Jandreau, 492 F.3d at n.4.

Overall, the Board finds that the October 2015 medical opinion is the most probative evidence of record as to whether the Veteran's current hearing loss was caused by his active service. Thus, the Board finds that while the Veteran's treatment records indicate that he currently has bilateral sensorineural hearing loss under 38 C.F.R. § 3.385 and his exposure to loud noise during combat service has been conceded, there is no basis upon which to attribute his current hearing loss to his period of service.

For the reasons explained above, the Board concludes that the evidence is against finding that the Veteran's hearing loss was caused by active service, or that his hearing loss was shown during or manifested to a compensable degree within one year of separation from active service. The preponderance of evidence is, therefore, against a finding of service connection for bilateral hearing loss and the appeal must be denied. There is no doubt to be resolved in this case. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 49.

ORDER

Service connection for PTSD is denied.

Service connection for a liver disability is denied.

Service connection for a kidney disability is denied.

Service connection for a bladder disability is denied.

Service connection for a pulmonary/respiratory disability is denied.

Service connection for GERD is denied.

Service connection for bilateral hearing loss is denied.

______________________________________________
KATHLEEN K. GALLAGHER
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs